# United States Court of Appeals for the Federal Circuit

---

**MARINE POLYMER TECHNOLOGIES, INC.,**
*Plaintiff-Appellee,*

**v.**

**HEMCON, INC.,**
*Defendant-Appellant.*

---

2010-1548

---

Appeal from the United States District Court for the District of New Hampshire in case no. 06-CV-0100, Judge Joseph A. DiClerico, Jr.

---

Decided: September 26, 2011

---

BRIAN M. POISSANT, Jones Day, of New York, New York, argued for the plaintiff-appellee. With him on the brief were OGNIAN V. SHENTOV, LYNDA Q. NGUYEN and JULIE M. BAHER.

RAYMOND A. KURZ, Hogan Lovells US, LLP, of Washington, DC, argued for the defendant-appellant. With him on the brief were CELINE JIMENEZ CROWSON and KEITH B. O'DOHERTY.

---

Before LOURIE, GAJARSA, and DYK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK. Dissenting opinion filed by *Circuit Judge* LOURIE..

DYK, *Circuit Judge*.

Defendant-Appellant HemCon, Inc. ("HemCon") appeals a judgment of the United States District Court for the District of New Hampshire that HemCon infringed Marine Polymer Technologies, Inc.'s ("Marine Polymer") U.S. Patent No. 6,864,245 (the "'245 Patent"). We conclude that HemCon has absolute intervening rights with respect to products manufactured before the date of reissue. We remand for a determination of whether HemCon has equitable intervening rights with respect to products manufactured after the date of reissue. As a result, we vacate the injunction and damages award. We find that HemCon's contention that the '245 Patent as originally issued was invalid is moot.

BACKGROUND

Marine Polymer owns the '245 Patent, which originally issued in March of 2005 and claims p-GlcNAc, a polymer extracted from another polymer called chitin. The polymer p-GlcNAc accelerates hemostasis (the process which causes bleeding to stop) and is useful in trauma units for treating serious wounds. Claims 6, 7, 10, 11, 12, 17, and 20 are asserted. Independent claim 6 is representative and discloses:

A *biocompatible* [p-GlcNAc] comprising up to about 150,000 N-acetylglucosamine monosaccharides covalently attached in a ß-1→4 conformation and having a molecular weight of up to about 30 million daltons in which at least one N-acetylglucosamine monosaccharide has been deacetylated.

'245 Patent, col.72 ll.5–10 (emphasis added).

The only disputed claim term on appeal is "biocompatible." Like claim 6, each of the claims of the '245 Patent requires that the p-GlcNAc be "biocompatible." *See, e.g.*, *id.* col.72 l.11. In this context, biocompatibility refers to the extent to which the p-GlcNAc causes a negative biological reaction (e.g., erythema, edema, or other skin conditions and irritations) when placed in contact with human tissue. The specification discloses four tests that can be used to determine the biocompatibility of a substance: an elution test, an implantation test, an intracutaneous injection test, and a systemic injection test. The elution test involves washing the substance with a solution to create an extract which is then tested on living cells to judge its toxicity. The implantation test involves implanting the substance into the muscle of a test animal and observing the reaction. The intracutaneous injection test involves injecting the substance into the skin of a test animal, and the systemic injection test involves multiple injections of different types (including intravenous and body cavity injections).

According to a chart disclosed in the specification, the elution test yields a score of zero to four on a biological reactivity scale, with zero representing no reactivity, one representing slight reactivity, two representing mild reactivity, and three or four representing moderate or severe reactivity, respectively. The specification explains that using the elution test, "p-GlcNAc[ ] meets the biocompatibility test if none of the cultures treated with [p-GlcNAc] show[s] a greater than mild reactivity" (i.e., no more than two on the reactivity scale). *Id.* col.42 ll.42–44. The specification also explains that p-GlcNAc can be biocompatible using the other three biocompatibility tests even if the polymer exhibits some biological reactivity. The other tests have similar scales for determining reac-

tivity, and all three allow the p-GlcNAc to pass the test even it exhibits some biological reactivity. *See id.* col.43 ll.54–60, col.44 ll.25–56, & col.45 ll.41–43.

As originally issued, three of the dependent claims (3, 12, and 20) specifically required an elution test score of zero (i.e., no reactivity under that test). Six of the original dependent claims (4, 5, 13, 14, 21, and 22) specifically required elution test scores of one or two (i.e., slight or mild reactivity under that test). The other claims did not include any explicit requirement that the p-GlcNAc meet a specific score on any of the biocompatibility tests.

Marine Polymer sued HemCon, alleging that HemCon infringed claims 6, 7, 10, 11, 12, 17, and 20 of the '245 Patent. During *Markman* proceedings, Marine Polymer argued that "biocompatible" should be construed to mean: "biomedically pure [p-GlcNAc] that reproducibly exhibits acceptably low levels of adverse bioreactivity, as determined by biocompatibility tests." *Marine Polymer v. HemCon*, No. 06-CV-100, slip op. at 2–3 (May 6, 2008) [hereinafter *Claim Construction Order*]. HemCon argued that "biocompatible" should be construed to limit p-GlcNAc to that which was "harvested" from a particular source (plant microalgae). *Id.* at 3. Alternatively, HemCon argued that "biocompatible" meant "suited for biomedical applications," a broad construction that in its view would render the patent clearly obvious. *Id.* at 15. The district court specifically considered all three proposed constructions but rejected them and adopted its own, concluding that "biocompatible p-GlcNAc" meant p-GlcNAc "polymers . . . with low variability, high purity, and *no detectable biological reactivity* as determined by biocompatibility tests." *Id.* at 24–25 (emphasis added).

Based on its claim construction, the district court granted summary judgment of literal infringement of all

seven asserted claims, relying on expert evidence that biocompatibility tests of HemCon's accused products had shown "no detectable biological reactivity." A jury trial was held to determine validity and damages. The jury found that the '245 patent was not anticipated, and also made factual findings related to obviousness. With respect to damages, the jury found that Marine Polymer was entitled to a reasonable royalty of approximately 88% of HemCon's profits. After the verdict, Hemcon filed motions for JMOL on anticipation and the jury's fact findings concerning obviousness. The trial court denied this motion, and subsequently made the ultimate determination that the '245 patent was not obvious. Hemcon also moved for JMOL arguing that the damages award was not supported by substantial evidence, which the district court also denied. The district court entered final judgment on September 22, 2010, granting reasonable royalty damages for the past infringement in the amount of $29,410,246.[1] On September 16, 2010, it also issued a permanent injunction barring future infringement of the asserted claims of the '245 Patent. The district court denied HemCon's request for a stay of the final judgment, damage award, and permanent injunction.

In August of 2009, during the pendency of the district court proceedings, HemCon requested reexamination of the '245 Patent at the United States Patent and Trademark Office ("PTO"). The examiner initially adopted a different claim construction than the district court, concluding that "biocompatible" meant "low variability, high purity, and *little or no detectable reactivity*." J.A. 39503 (emphasis added). In this preliminary rejection, the

---

[1] In December 2010, the district court granted Marine Polymer's motion to amend the judgment to include damages for sales made up to the date of the final judgment.

examiner noted his disagreement with the district court's claim construction. He explained that the court's construction was inconsistent with the numerous dependent claims that required a specific elution test score of zero, one, or two. Based on that construction, he issued a preliminary rejection of all the claims of the '245 Patent as invalid in light of the prior art. He relied primarily on three pieces of prior art—an article by a doctor in the relevant field (the Sandford reference) and two previously issued patents disclosing p-GlcNAc (the Peniston and Malette patents)—finding that each explicitly disclosed nearly all of the limitations of every claim. With respect to the "biocompatibility" limitation, he explained that "any difference between the claimed biocompatibility and that disclosed by [the three prior art references] is minor and would have been obvious to [a] person of ordinary skill in the art." J.A. 39507, 39517, 39522.

In response, Marine Polymer argued to the PTO that "the [district court's] interpretation of the term 'biocompatible' should be adopted in this reexamination" (i.e., that "biocompatible" should be construed to mean "no detectable biological reactivity"). J.A. 37690. Marine Polymer also cancelled the six original dependent claims that had specifically required an elution test score of one or two (i.e., that explicitly required at least some reactivity). *See* J.A. 37683. The examiner then approved the claims as amended, noting that "[w]ith the cancellation of the claims which required . . . elution test scores [of] 1 or 2, [he] now agree[d] with the [district] court's definition of the term biocompatible." J.A. 39481.

The PTO did not issue its notice of intent to issue the reexamination certificate for the '245 Patent until November 3, 2010, which was after the district court had entered its final judgment on September 22, 2010. HemCon timely appealed the district court's judgment. On

November 18, 2010, we granted a stay of the district court's final judgment and permanent injunction pending appeal. On March 29, 2011, the PTO issued a reexamination certificate, cancelling dependent claims 4, 5, 13, 14, 21, and 22. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). We review the district court's claim construction determination and its grant of summary judgment de novo. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). We review the district court's denial of a JMOL motion de novo. *See SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1377 (Fed. Cir. 2010).

DISCUSSION

I

HemCon argues that the district court's finding of infringement should be reversed because Marine Polymer changed the scope of the '245 Patent's claims on reexamination and, therefore, HemCon is entitled to intervening rights. While this issue arose after the district court judgment, Marine Polymer does not contend that we are barred on this appeal from considering the issue, and we conclude that we have the discretion on appeal to consider events as to which judicial notice is appropriate that arise after a judgment.[2] Under the statute, there are two types

---

[2] *See, e.g.*, *Watts, Watts & Co. v. Unione Austriaca Di Navigazione*, 248 U.S. 9, 21 (1918) (holding that "court[s] must consider the changes in fact and in law which have supervened since the decree was entered below," particularly when reviewing questions of law de novo, and reversing the district court's dismissal of an admiralty suit between belligerents in a foreign war because the United States had since entered the war, creating jurisdiction under admiralty law); *Nonnette v. Small*, 316 F.3d 872, 877 (9th Cir. 2002) (vacating the district court's dismissal of plaintiff's 42 U.S.C. § 1983

of intervening rights: (1) absolute intervening rights, which bar claims for infringement based on specific products that were manufactured before the reissue or reexamination; and (2) equitable intervening rights, which bar claims for infringement for new products and newly manufactured versions of prior existing products made after the reissue or reexamination. *See* 35 U.S.C. §§ 252, 307. We think it appropriate to decide the question of absolute intervening rights without remand because it is a pure question of law. However, we conclude that the district court should consider the question of equitable intervening rights in the first instance since fact questions are involved. We consider first the issue of absolute intervening rights as a defense.

The doctrine of absolute intervening rights protects an accused infringer's right to continue using, selling, or offering to sell specific products covered by reissued or reexamined claims when the particular accused product

claim because plaintiff was no longer incarcerated and, therefore, a habeas proceeding was no longer a prerequisite to proceeding under § 1983); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972) (reversing district court's refusal to certify class action based on attorney who would not adequately represent class because a new attorney had been substituted on appeal and "the new situation demands one result only, and discretion could not be exercised either way"); *see also L.E.A. Dynatech Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995) (explaining that an "appellate court will consider an issue not presented below" if it, inter alia, "involves a pure question of law and refusal to consider it would result" in an injustice or "the appellant had no opportunity to raise the objection at the district court level"); *Borlem-S.A.-Empreediments Industrias v. United States*, 913 F.2d 933, 939 (Fed. Cir. 1990) ("[A] reviewing court is not precluded . . . from considering events which have occurred between the date of an agency (or trial court) decision and the date of decision on appeal.").

had been made before the date of the reissue or reexamination and the scope of the claims is substantively changed. 35 U.S.C. § 252; *see also* 35 U.S.C § 307(b) (applying the provisions of § 252 to "amended or new claim[s] determined to be patentable and incorporated into a patent following a reexamination"). "The specific things made before the date of reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of the reissue without regard to the patent." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993). In other words, the statute "provides an accused infringer with the absolute right to use or sell a [specific] product that [it] made, used, or purchased before the grant of the reissue[d] [or reexamined] patent." *Id.*

However, intervening rights do not apply where the accused product "infringes a valid claim of the reissued patent which was in the original patent." 35 U.S.C. § 252. Therefore, intervening rights are available only if the original claims have been "substantively changed," and "in determining whether substantive changes have been made, we must discern whether the *scope* of the claims [has changed], not merely whether different words are used." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). Essentially, "the making of substantive changes in the claims [on reexamination] is treated as an irrebuttable presumption that the original claims were materially flawed." *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1249 (Fed. Cir. 1997). Therefore, if we conclude that the scope of asserted claims of the '245 Patent was substantively changed on reexamination, HemCon is entitled to absolute intervening rights, and we must reverse the district court's judgment of infringement.

The basis for the claim of intervening rights here is that, on reexamination, Marine Polymer urged the examiner to adopt the district court's claim construction that required p-GlcNAc to have "no detectable biological reactivity." HemCon argues that, as correctly construed, the original claims of the '245 Patent did not have such a limitation and the adoption of the district court's erroneous construction substantively changed the scope of the claims. Marine Polymer argues that HemCon is not entitled to intervening rights for several reasons. First, it argues that the doctrine of intervening rights cannot apply here because the actual language of the asserted claims of the '245 Patent was not amended on reexamination. However, as noted above, the critical question is "whether the *scope* of the claims" has been changed and "not merely whether different words are used." *Laitram Corp.*, 163 F.3d at 1346. Although we have not directly addressed whether arguments made to the PTO during reexamination can amend the scope of claims for purposes of the intervening rights doctrine, we have consistently held that arguments made to the PTO on reexamination can create an estoppel or disavowal and thereby change the scope of claims even when the language of the claims did not change.

In *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996), we held that a patentee surrendered any claim to disposable briefs for children with "ultrasonic bonded seams" when she made statements on reexamination distinguishing her patent claiming disposable briefs from those disclosing bonded seams. *Id.* The claims were effectively narrowed after reexamination to exclude briefs with bonded seams simply based on the arguments she made to distinguish the prior art. *See id.*

We recently reiterated this principle in *American Piledriving Equipment, Inc v. Geoquip, Inc.*, 637 F.3d

1324, 1336 (Fed. Cir. 2011). There, we held that the patentee disclaimed claim scope on reexamination by arguing that certain claims should be allowed over the prior art because the claimed "integral" components were comprised of "one piece." *Id.* The patentee asserted that its argument to the PTO did not constitute a disavowal of claim scope because "it did not amend its claims" and because the examiner did not agree with that particular argument. We rejected these contentions, finding that the patentee "cannot attempt to distance itself from the disavowal of broader claim scope" because it had "unambiguously argued that 'integral' meant 'one-piece' during reexamination." *Id.*; *see also CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1362 (Fed. Cir. 2007) (holding that argument to PTO on reexamination constituted disavowal of claim scope even though "no amendments were made"); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 867–869 (Fed. Cir. 2004) (holding that after initial examination the claim in suit "[did] not necessarily require" that a surgical device be "pleated" but that arguments made during reexamination constituted a "clear disclaimer of scope" requiring "pleating").

We see no reason why this rule, giving effect to disclaimer of claim scope during reexamination or reissue, should not also apply in the context of intervening rights. In fact, a contrary rule would allow patentees to abuse the reexamination process by changing claims through argument rather than changing the language of the claims to preserve otherwise invalid claims and, at the same time, avoid creating intervening rights as to those claims. Therefore, if the scope of the claims actually and substantively changed because of Marine Polymer's arguments to the PTO, the claims have been amended by disavowal or estoppel, and intervening rights apply. This is so even

though Marine Polymer did not amend the language of its claims on reexamination.

Second, Marine Polymer asserts that the district court's claim construction of "biocompatible" was correct and that, therefore, the scope of the claims was not altered on reexamination. However, the district court erred in construing the claims to require "no detectable biological reactivity." *Claim Construction Order*, at 24–25. The specification makes clear that p-GlcNAc "meets the biocompatibility test if none of the cultures treated with [the polymer] show[s] a *greater than mild* reactivity." '245 Patent col.42 ll.42–44 (emphasis added). In other words, the specification indicates that a polymer is "biocompatible" under the elution test as long as it achieves a score of zero to two on the elution test (i.e., has no to mild reactivity). Six dependent claims in the original patent specifically required that the "biocompatible" p-GlcNAc have an elution test score of either one or two (i.e., slight or mild reactivity). These dependent claims (which were cancelled on reexamination in order to create consistency with the district court's claim construction) indicate that the term "biocompatible" must include slight or mild biological reactivity. Moreover, as explained above, the specification indicates that p-GlcNAc satisfies the requirements of all four biocompatibility tests even if it shows a small amount of biological reactivity.

Although Marine Polymer points to a statement in the specification noting that the "p-GlcNAc of the invention exhibits a high degree of biocompatibility," '245 Patent, col.10 ll.49–50, there is nothing in the specification indicating that the claims are so limited. The claims themselves use only the term "biocompatib[ility]," *e.g.*, *id.*, col.72 ll.5, not "a high degree of biocompatibility." In a similar vein, Marine Polymer also relies on the fact the p-GlcNAC tested in the specification's working example

"exhibit[ed] no detectable biological reactivity" under any of the disclosed biocompatibility tests to argue that the specification defined "biocompatible" as such by implication. *Id.* col.41 ll.67. However, this statement relates to a single example, and does not suggest that the claims are so limited. *See, e.g.*, *Silicon Graphics, Inc. v. AT1 Techs., lnc.*, 607 F.3d 784, 792-93 (Fed. Cir. 2010) (refusing to read a single embodiment in the specification into the claims absent clear indication that the patentee intends them to be "strictly coextensive"); *Bell Atl. Network Servs., lnc. v. Covad Commc'ns Grp., lnc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (refusing to use language in the specification to define claim term "by implication" where that language was not used consistently throughout the patent). Therefore, the district court's claim construction was incorrect, and the original claims permitted p-GlcNAc that exhibited some biological reactivity.

Third, relying on language from the district court, Marine Polymer contends that HemCon has waived its argument that the proper claim construction of "biocompatible" in the original claims required at least some biological reactivity because it did not raise any claim construction argument below relating to the level of biological reactivity. This is a situation in which the district court adopted neither party's proposed claim construction, and instead adopted its own construction. Contrary to the district court's view, it is well established that parties may raise specific claim construction arguments for the first time on appeal that "protect the original breadth [of the party's proposed] claim construction by rejecting the imposition of an additional limitation not required or recited by [that claim construction]." *Interactive Gift Express v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001). These arguments must simply be consistent with the claim construction proffered by that party

below. *See Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1306–07 (Fed. Cir. 2006). Here, HemCon argued below that the proper claim construction for "biocompatible" was "suited for biomedical applications."[3] *Claim Construction Order*, at 15.

The district court's addition of the requirement that the p-GlcNAc show "no detectable biological reactivity" imposed an additional claim limitation that narrowed HemCon's proposed construction and narrowed the scope of the claims, thus making them more likely valid. Hem-Con's failure to further argue the claim construction below was no waiver of its right to argue that the additional limitation imported by the district court was incorrect. In other words, HemCon is entitled to "protect the original breadth" of the proposed claim construction by arguing that the district court improperly added the no reactivity limitation.

Lastly, Marine Polymer argues that, even if it changed the scope of most of the claims on reexamination, it did not change the scope of original claims 12 and 20, which already required "an elution test score of 0" (i.e., no reactivity). '245 Patent, col.72 ll. 34–35, 61. However, the scope of claims 12 and 20 was also substantively changed. Those two original claims specifically required an *elution test* score of zero, but did not reference any other testing method despite the fact that the specification disclosed four distinct testing methods (and described testing

---

[3]    Marine Polymer argues that HemCon also did not sufficiently raise this claim construction below. However, the district court explicitly addressed and rejected this proposed construction in its claim construction order. *See Claim Construction Order*, at 15. Although HemCon also argued that "biocompatible" should be construed to limit p-GlcNAc to that harvested from plant microalgae, it does not raise that proposed construction on appeal.

results of p-GlcNAc under each test). Given the specification's reference to three other tests and the reference in the claims to only the elution test, we conclude that original claims 12 and 20 required a showing of no reactivity on only the elution test. The claims covered p-GlcNAc that passed one of the other biocompatibility tests even while displaying slight reactivity. After Marine Polymer imported the district court's erroneous claim construction on reexamination, the claims required that the p-GlcNAc exhibit "no detectable biological reactivity" under any of the specified tests. *Claim Construction Order*, at 24–25. The district court's claim construction required "no detectable biological reactivity as determined by biocompatibility *tests*" generally. *Id.* (emphasis added). Just as the district court's construction narrowed the original claims by requiring "*no* detectable biological reactivity," it narrowed claims 12 and 20 by defining the term "biocompatible" to require that the p-GlcNAc exhibit no reactivity under any biocompatibility tests that were performed. Adoption of that construction changed the scope of claims 12 and 20 because p-GlcNAc that exhibited some reactivity on one of the other biocompatibility tests (other than the elution test) would no longer fall within the scope of claims 12 and 20. HemCon is entitled to absolute intervening rights as to all claims, including claims 12 and 20.

We reverse the district court's grant of judgment of infringement to Marine Polymer on the ground of absolute intervening rights.[4]    The absolute intervening rights

---

[4]    HemCon also argued that it did not literally infringe claims 12 and 20 because its products cannot undergo elution testing, as required by the claims. However, HemCon waived this argument because it did not raise it in opposing summary judgment. The failure to raise an affirmative defense in response to a summary

defense requires reversal of not only the district court's damage award but also of its permanent injunction because, as it currently stands, the injunction would prohibit HemCon from using, selling, or offering to sell any of its accused products produced before the reexamination date even if the particular item had been manufactured before the reexamination date. As explained above, the doctrine of absolute intervening rights protects such activity.

## II

HemCon also contends that it is entitled to equitable intervening rights. The doctrine of equitable intervening rights allows the court to "permit[ ] the continued manufacture, use, or sale of *additional products* covered by the reissue[d] [or reexamined] patent when the [accused infringer] made, purchased, or used identical products . . . before the reissue [or reexamination] date." *BIC Leisure*, 1 F.3d at 1221 (emphasis added); *see also* 35 U.S.C. §§ 252, 307(b). In other words, it protects an accused infringer's ability to make, sell, offer to sell, or use particular items of the same type that the accused infringer had made, purchased, or used before the reexamination even if the particular item was produced thereafter. It also protects a newly created product that was not of a type produced before the reexamination if the accused infringer made "substantial preparations" for manufacture of the product before the reissue or reexamination. *See Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001); *see also* 35 U.S.C. § 252.

---

judgment motion constitutes a waiver of that defense. *See, e.g.*, *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1366–67 (Fed. Cir. 2003); *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352–53 (Fed. Cir. 1999).

The inquiry as to whether equitable intervening rights should apply is a fact intensive one, involving consideration of numerous issues. For example, some relevant factors include: 1) whether non-infringing goods can be manufactured from the inventory used to manufacture the infringing product; 2) whether there are "existing orders" for the products; 3) whether the accused infringer made "substantial preparation" to manufacture the products before the reexamination or reissue; and 4) whether the accused infringer relied on the original patent scope in making these preparations. *See Seattle Box Co. v. Indus. Crating & Packing Inc.*, 756 F.2d 1574, 1580–81 (Fed. Cir. 1985). The district court has made no factual findings related to these various fact-intensive inquiries. We therefore remand to the district court to determine in the first instance whether HemCon is entitled to equitable intervening rights.

III

Finally, HemCon argues that, under its proposed claim construction of "biocompatible" as "suited for biomedical applications," the original asserted claims of the '245 Patent (i.e., the claims before the district court's erroneous construction was adopted on reexamination) are invalid as obvious.[5] However, given that Marine Polymer substantively changed the scope of these claims on reexamination, we conclude that this dispute is moot

---

[5] Below, HemCon asked the district court for JMOL on both obviousness and anticipation grounds. However, on appeal, HemCon makes no reference to anticipation and contends that "the prior art" (as opposed to one specific reference) discloses all the limitations of the asserted claims. *See, e.g.*, Appellant's Br. 48. Therefore, we interpret HemCon's invalidity contentions as raising only an obviousness challenge.

and decline to reach it.[6]   "The purpose of the reexamination procedure is to permit a patentee . . . to obtain review [of the validity of the patent] and if necessary [to permit] correction of the claims" to preserve their validity. *Bloom Eng'g*, 129 F.3d at 1249. The reexamination statute itself makes this purpose clear by providing that "the patent owner [is] permitted to propose any amendment to his patent and a new claim or claims thereto, in order to distinguish the invention as claimed from the prior art" but cannot "enlarg[e] the scope of a claim of the patent." 35 U.S.C. § 305. As a result, "the making of substantive changes in the claims [during reexamination] is treated as an irrebuttable presumption that the original claims were materially flawed." *Bloom Eng'g*, 129 F.3d at 1249. Under the reexamination scheme, Marine Polymer effectively surrendered its original claims in order to preserve the patent's validity. Therefore, the validity of the original claims is no longer a live issue, as future infringement claims will either be based on the reexamined claims or will be barred by the intervening rights doctrine.

IV

A consequence of our holding is that both the injunction and damages award must be vacated. If HemCon does have equitable intervening rights, neither damages nor an injunction would be appropriate. In any event, because HemCon has absolute intervening rights, there can be no damages award for products manufactured before the date of reissue. With respect to products manufactured after the date of reissue, damages and an injunction would be appropriate if HemCon did not have equitable intervening rights. For the foregoing reasons,

---

[6]   Notably, HemCon only asked us to reach the issue if we found that the scope of the claims was not changed on reexamination.

we vacate the injunction and damages award and remand for proceedings consistent with this opinion.

**REVERSED IN PART, VACATED IN PART, and REMANDED**

Costs

No costs.

# United States Court of Appeals for the Federal Circuit

---

**MARINE POLYMER, INC.,**
*Plaintiff-Appellee,*

**v.**

**HEMCON, INC.,**
*Defendant-Appellant.*

---

2010-1548

---

Appeal from the United States District Court for the District of New Hampshire in case no. 06-CV-0100, Judge Joseph A. DiClerico, Jr.

---

LOURIE, *Circuit Judge*, dissenting.

I respectfully dissent from the reversal of the district court's holding of infringement in this case. The majority holds that intervening rights apply to claims 12 and 20 because during reexamination the patentee successfully argued for the district court's claim construction and cancelled other patent claims (claims not asserted in this litigation). It therefore finds that the holding of infringement was incorrect and reverses that holding.

First, the district court did not have before it the results of the reexamination proceeding, which was ongoing during the district court trial. While the majority finds

that it is appropriate to consider the reexamination proceeding, I consider it unwise. We should have the benefit of the district court's view on the effect of the reexamination proceeding rather than review it ourselves in the first instance. Procedurally, the reexamination proceeding could have been appealed here, and our taking into consideration the results of that proceeding, which may not have been final, could have unfairly deprived the patentee of its right to have its infringement proceeding decided separately from a non-final PTO proceeding.

Yet even if it were proper for us to consider the issue in our review of the district court's decision, I believe that intervening rights should not apply here. Intervening rights under 35 U.S.C. §§ 307(b) and 316(b) apply only to "amended or new claims." Thus only "amended or new claims" have the effect specified in 35 U.S.C. § 252. Claims 12 and 20 were not new or amended. They are claims from the original patent and their language was not in any way changed. An unchanged original claim should not be considered to be changed for intervening rights purposes based in part on the cancellation during a separate reexamination proceeding of other claims in the patent. The patentee's arguments and cancellation of six claims requiring an elution test score of 1 or 2 may or may not have affected the *scope* of claims 12 and 20, both of which require an elution test score of 0, but it did not "amend" the claims or make them "new" claims, and that is what the statutory language requires.

The majority errs by relying on the language of § 252 that claims in a reissue and reexamination patent have the same effect as originally granted claims so as long as they are "substantially identical." Moving first to this analysis, however, misses the threshold requirement in §§ 307(b) and 316(b) that intervening rights apply only to amended or new claims.

I therefore conclude that the majority should not have relied on the results of the reexamination proceeding and, even if it were proper for them to do so, the majority should have found that intervening rights did not apply to claims 12 and 20, as they were not "amended or new claims."    Accordingly, I dissent from the reversal of the holding of infringement.